**Vera J. LAMPO, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.**

**No. 3:04–CV–90081.**

United States District Court, S.D. Iowa, Davenport Division.

June 2, 2005.

Michael DePree, Bowman & Depree, Davenport, IA, for Vera Lampo, Plaintiff.

Gary L. Hayward, United States Attorney, Des Moines, IA, for Commissioner of Social Security, Defendant.

## ORDER

PRATT, District Judge.

Plaintiff, Vera J. Lampo, filed a Complaint in this Court on August 3, 2004, seeking review of the Commissioner's decision to deny her claim for Social Security benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g). For the reasons set out herein, the decision of the Commissioner is reversed.

## BACKGROUND

Plaintiff filed an application for Social Security Disability Benefits on August 17, 2001, claiming to be disabled since July 24, 2001. Tr. at 51–54. Plaintiff, whose date of birth is December 9, 1959, was 41 years old at the time of her application. Tr. at 51. After the application was denied, initially and on reconsideration, Plaintiff requested a hearing before an Administrative Law Judge. A hearing was held before Administrative Law Judge John P. Johnson (ALJ) on January 31, 2003. Tr. at 272–325. The ALJ issued a Notice Of Decision—Unfavorable on August 12, 2003. Tr. at 12–24. After the decision was affirmed by the Appeals Council on June 19, 2004, (Tr. at 6–9), Plaintiff filed a Complaint in this Court on August 3, 2004.

Following the sequential evaluation set out in the regulations, the ALJ found that Plaintiff has not engaged in substantial gainful activity at any time after July 18, 2001. He found that a brief period of work was an unsuccessful work attempt. The ALJ found that Plaintiff has severe impairments related to her heart and carpal tunnel surgery. He found that none of Plaintiff's impairments were of a severity that they met the requirement of any listed in the regulations so as to entitle Plaintiff to a finding of disability at the third step of the sequential evaluation. At the fourth step, the ALJ found that Plaintiff has the residual functional capacity for lifting up to 20 pounds occasionally and 10 pounds frequently; that she can walk up to three blocks and stand up to an hour at a time; that she can occasionally bend, stoop, squat, kneel, crawl, and climb, but that she must avoid working at unprotected heights or exposure to excessive heat, cold and humidity. With that residual functional capacity, the ALJ found that Plaintiff is able to do her past relevant work as a spray painter helper as she described it. He also found that there are other unskilled jobs that she is able to perform. The ALJ, therefore, found that Plaintiff is not disabled or entitled to the benefits for which she applied. Tr. at 23–24.

## REVIEW OF MEDICAL EVIDENCE

On April 13, 2001, Plaintiff went to an emergency room complaining of chest pain. An EKG was normal and the pain was thought to be from bronchitis, or airway irritation from cigarettes. Jane A. Hartnett, M.D., who saw Plaintiff in the emergency room, wrote that she also suspected an element of anxiety due to stress in Plaintiff's life. Tr. at 131–32.

Plaintiff was hospitalized at Regional Medical Center in Manchester, Iowa from July 18, to 19, 2001. The principal diagnosis was inferior myocardial infarction. Because it was determined that emergency angiography was needed, Plaintiff was sent by ambulance to a hospital in Cedar Rapids, Iowa. Tr. at 135–36. Plaintiff was admitted to St. Luke's Hospital in Cedar Rapids on July 19, 2001, and discharged on

the 28th. Plaintiff underwent a cardiac catheterization on the 19th, and a coronary artery bypass on July 24, 2001. On discharge, Plaintiff was walking, and taking oral medication. Tr. at 148. On August 1, 2001, Plaintiff complained to Dr. Hartnett of pain on the left side of her chest which the doctor opined was due to muscle spasm and rib pressure and possibly nerve compression at the time of surgery. Tr. at 163.

Plaintiff was seen by A. Ersin Atay, M.D., at the Manchester hospital for a follow up examination. Plaintiff was smoking again, and had elected not to attend cardiac rehabilitation. (At the hearing, Plaintiff explained that she did not have insurance to pay for second stage cardiac rehabilitation and could not pay for it herself. Tr. at 313). Dr. Atay released Plaintiff for work. The doctor urged Plaintiff to discontinue smoking. Tr. at 191.

On September 22, 2001, Plaintiff went to the emergency room complaining of chest pain. Plaintiff reported that she had been feeling well and that she had gone back to work as a waitress. Kim Brandt, M.D., who saw Plaintiff at the hospital, diagnosed costochondritis and myofascial pain. Tr. at 168.

In a letter to Dr. Hartnett dated October 26, 2001, James M. Levett, M.D., who had seen Plaintiff when she was a patient at St. Luke's (Tr. at 154), wrote that he had seen Plaintiff for a followup examination. Plaintiff reported that she had restarted smoking. Dr. Levett counseled Plaintiff about the importance of stopping smoking, and encouraged her to walk as much as possible. Tr. at 175.

On February 13, 2002, Timothy F. Kresowik, M.D., a professor of vascular surgery at The University of Iowa, wrote to Dr. Hartnett regarding Plaintiff's incapacitating claudication. Dr. Kresowik noted Plaintiff's history of coronary artery by-

pass. A magnetic resonance angiogram showed evidence of severe inflow occlusive disease. She had a right iliac occlusion and on the left side, she had a very tight stenosis at the iliac bifurcation. Tr. at 245. On March 25, Plaintiff underwent a left iliac stent with balloon angioplasty and femoral to femoral left to right bypass (Tr. at 199 report of surgery). Dr. Kresowik, M.D., wrote that there were no complications, and on discharge, Plaintiff's condition was good, she was ambulatory, and taking oral medication for pain. Tr. at 196.

Plaintiff saw Dr. Kresowik on October 1, 2002. Plaintiff complained of recurrent symptoms in her right leg. Plaintiff described pain in her whole leg which could occur with just standing. She did not describe any left leg pain. The doctor wrote that Plaintiff had a history of low back problems. The doctor wrote:

> Ms. Lampo underwent a repeat evaluation of her bypass. It was widely patent without evidence of stenosis. She has good triphasic femoral waveforms bilaterally. Her ankle-arm indices were 1.0 on the left and 0.96 on the right with excellent transmetatarsal pulse-volume recordings.
>
> Ms. Lampo appears to have a widely patent reconstruction. Based on the nature of her symptoms, I do not think her right leg symptoms are vascular in origin. I suggested they may be possibly related to back disease.

Tr. at 236.

On November 13, 2002, Dr. Hartnett wrote to Plaintiff's counsel. The doctor stated that she did not have enough information to complete a form that had accompanied a letter from counsel. Dr. Hartnett reviewed her treatment of plaintiff. The doctor stated that Plaintiff has coronary artery disease and vascular disease in her lower extremities. She said that an

evaluation at the University of Iowa on October 1, 2002 (see above), "revealed the vascularization to her lower extremities is widely patent and therefore should currently not be limiting her activities in any way." At the time of the October evaluation, Plaintiff complained of pain in her right leg. The vascular surgeon thought that the pain was related to Plaintiff's back. Studies on Plaintiff's back in 1999, according to the doctor, had been unremarkable. Tr. at 231. The doctor also stated that Plaintiff has a history of surgery for carpal tunnel in 2000, on the right wrist. Dr. Hartnett noted that Plaintiff continued to smoke which was aggravating her sinuses and was a concern given her vascular problems. Tr. at 232. Although the doctor cited no specific limitations, she opined that Plaintiff was "disabled because of low back pain, leg pain, and/or wrist/hand pain..." Tr. at 233.

On March 3, 2003, University of Iowa cardiologist Chad L. Williams, M.D., wrote to Dr. Kresowik, M.D., that he had seen Plaintiff for follow up of her coronary artery bypass surgery. Plaintiff was not having anymore atypical chest pain. Plaintiff was only able to walk three blocks due to claudication but was exercising on a regular basis. Plaintiff complained of "intolerable fatigue and insominia secondary to the Toprol[1]." The doctor stated that he stopped the Toprol because of the disabling fatigue. Among the doctor's recommendations was that Plaintiff was clear for full time work with no limitations. Tr. at 247. Plaintiff requested her hearing on August 22, 2002 (Tr. at 44), and reported

that she was still taking Toprol. Tr. at 118. A University of Iowa note dated September 12, 2003, states that Plaintiff called for a refill of the Toprol. Plaintiff was told that Dr. Williams had discontinued the medication. "Patient reports that it was indeed discontinued with her last visit with Dr. Williams secondary to fatigue but restarted within 4 or 5 days secondary to HTN (hypertension) and headache. Dr. Chad Williams notified of prescription renewal authorization." Tr. at 263. When Plaintiff was seen at the hospital in Manchester, Iowa in July 2001, her medications were Nexium, Aspirin, and Premarin. Tr. at 138. When Plaintiff was discharged from St. Luke's Hospital in Cedar Rapids on July 28, 2001, Toprol was listed among her discharge medications, and peripheral vascular disease was listed as one of the diagnoses. Tr. at 148–49. When Plaintiff was seen at the University on September 16, 2003 for acute bronchitis/sinusitis, Toprol was listed among her medications. Tr. at 270. In other words, Plaintiff was taking Toprol as prescribed during all times relevant to the case.

## HEARING TESTIMONY

Plaintiff appeared and testified before the ALJ on January 31, 2003. Tr. at 272–325. Plaintiff testified that her primary occupation had been that of a waitress. She did that kind of work for 12 years. Plaintiff did not graduate from high school, but said that she obtained her GED. Plaintiff said that she became unable to work in 2001 after her heart attack. Tr. at 279.

---

1. Toprol is a $beta_1$-selective (cardioselective) adrenoceptor blocking agent. The medication is indicated for the treatment of hypertension, long-term treatment of angina pectoris, the treatment of stable, symptomatic (N.Y.HA Class II or III) heart failure of ischemic, hypertensive, or cardiomyopathic origin. Among the adverse reactions, the following is noted: "Central Nervous System: Tiredness and dizziness have occurred in about 10 of 100 patients. Depression has been reported in about 5 of 100 patients. Mental confusion and short-term memory loss have been reported. Headache, somnolence, nightmares, and insomnia have also been reported." 2004 WL 2459315 (Physicians' Desk Reference)

Plaintiff testified that she is unable to work due to pain in her legs, chest wall pain, and fatigue due to medication. Tr. at 280. Plaintiff said that she has constant pain in her legs. She said that she had to push herself extremely hard just to get up. Tr. at 283. She said that there were times she could not move and had to be carried to the bathroom. Tr. at 284. Plaintiff said that before bypass surgery on her legs, she was able to walk six to eight blocks, and that after the surgery she can only walk about three blocks. Plaintiff said that the chest wall pain is from the surgery on her heart, and that the doctor told her that it would never go away. Plaintiff also said that she had pain in her left hand. The hand goes to sleep and feels numb. Tr. at 286. She said the doctor told her that the numbness in her hand had been caused by the surgery to take a vein to put into her heart. Tr. at 287. Regarding her fatigue, Plaintiff said that she takes naps during the day, usually after being up for a couple of hours. She said: "If I'm not on the couch sleeping, I sit in my recliner and fall asleep there four or five times a day." She said that she goes to bed at 10:00 p.m., and doesn't get up until 11:00 a.m. During the day, Plaintiff takes between four and five naps per day. Tr. at 288.

Plaintiff testified that she can sit for a half hour or 45 minutes and stand about 45 minutes. Plaintiff said that she does not do any chores around the house, that those things are done by other members of her family. Tr. at 290. She said that she may fold some of the clothes that come out of the laundry. Tr. at 291. Plaintiff said that she can walk about three blocks, after which she needs to elevate her legs for 15 or 20 minutes. Tr. at 292. She said that her doctor told her to elevate her legs whenever she is sitting. Plaintiff said that she does not drive outside of her home town, because of her legs. She said that her son does the shopping and puts the groceries away. Tr. at 293.

Plaintiff needed a break during which Plaintiff's husband and son testified on her behalf. Tr. at 294–300. At the conclusion of Plaintiff's break, she continued her testimony. Tr. at 300. After Plaintiff and the ALJ discussed the nature of her past work (Tr. at 301–06), the ALJ asked her what doctor at the University of Iowa had told her after tests in October 2003. Plaintiff answered that the doctor had told he that she needed bypass surgery so that her leg would receive blood. She said that the pain in her right leg is brought on by walking. Tr. at 307. She also said that standing causes her leg to hurt. Tr. at 308. Plaintiff said that when her pain becomes severe, she calls for a prescription which is dispensed four pills at a time. On most days, she said, she takes three Tylenol, three times a day. Tr. at 313.

After Plaintiff testified, the ALJ called Carma Mitchell to testify as a vocational expert. Tr. at 315. The ALJ asked two hypothetical questions, the first of which reflected the residual functional capacity found by the ALJ in his Notice of Decision. Tr. at 319. At the conclusion of her testimony, the ALJ asked the vocational expert if there were factors she had noted in the record that were not reflected in either of his questions. In response, the vocational expert testified that the need to sit with legs elevated, and the need to take naps throughout the work day would preclude competitive work. Tr. at 323–24.

## DISCUSSION

Our review is limited to determining whether the Commissioner's decision is supported by substantial evidence on the record as a whole. *Raney v. Barnhart,* 396 F.3d 1007, 1009 (8th Cir.2005). "Substantial evidence is relevant evidence that a reasonable mind would ac-

cept as adequate to support the Commissioner's conclusion." *Young v. Apfel,* 221 F.3d 1065, 1068 (8th Cir.2000). In reviewing the Commissioner's decision, we do not substitute our own view of the evidence for that of the Commissioner. *Kelley v. Barnhart,* 372 F.3d 958, 960 (8th Cir.2004). Whether the record supports a contrary result or whether we might decide the facts differently is immaterial. We must affirm the Commissioner's decision if the findings are supported by substantial evidence. *Roberts v. Apfel,* 222 F.3d 466, 468 (8th Cir. 2000).

*Tellez v. Barnhart,* 403 F.3d 953, 956 (8th Cir.2005).

■ In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel,* 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger,* 522 F.2d 13, 16 (8th Cir. 1975). *See also Patrick v. Barnhart,* 323 F.3d 592, 595 (8th Cir.2003).

■ This case turns on whether or not Plaintiff is credible when she testified to disabling fatigue. It is well settled law in the Eighth Circuit that while credibility findings are, in the first instance, for the ALJ, a finding that the testimony of a claimant is not credible must be supported by good reasons. Here, at first glance, Plaintiff's testimony regarding her fatigue sounds somewhat extreme and difficult to believe. Closer examination of the medical evidence, however, provides the evidence which supports Plaintiff's testimony and lends credibility thereto.

Plaintiff has been consistent in her complaints of fatigue to her physicians, both locally and at the University of Iowa. One must keep in mind that Plaintiff's alleged onset of disability date is July 24, 2001. It was during the hospitalization between July 19 and 28, 2001, that the medication Toprol was prescribed. As shown above in

footnote 1, fatigue is a known side effect of Toprol, and Plaintiff's fatigue is attributed to that medication by Dr. Kresowik, who described it as disabling. The doctor attempted to discontinue the medication, but had to restart it because of Plaintiff's blood pressure and because she complained of headaches. In other words, Plaintiff's testimony regarding her fatigue is supported by the medical record, as well as being corroborated by her family. The ALJ did not provide good reasons for not giving full credibility to Plaintiff's testimony.

The record of this case does not lend itself to inconsistent conclusions. Although Plaintiff is not totally bed ridden, and may be able to prepare a meal from time to time, the record does not provide evidence that she can engage in substantial gainful activity on a day in and day out basis as is required to support a finding of not disabled. *See Forehand v. Barnhart,* 364 F.3d 984, 988 (8th Cir.2004), citing, among other cases, *McCoy v. Schweiker,* 683 F.2d 1138, 1147 (8th Cir.1982)(en banc).

The ALJ's decision is without support of substantial evidence in the record as a whole. When the vocational expert considered the effects of Plaintiff's fatigue, it was her testimony that competitive work is not possible. A remand to take additional evidence, therefore, would only delay the benefits to which Plaintiff is entitled. In such circumstances, the Court may reverse and order an award of benefits. *Duncan v. Barnhart,* 368 F.3d 820, 824 (8th Cir.2004), citing *Gavin v. Heckler,* 811 F.2d 1195, (8th Cir.1987).

**CONCLUSION AND DECISION**

It is the holding of this Court that Commissioner's decision is not supported by substantial evidence on the record as a whole. The Court finds that the evidence

in this record is transparently one sided against the Commissioner's decision. *See Bradley v. Bowen,* 660 F.Supp. 276, 279 (W.D.Ark.1987). A remand to take additional evidence would only delay the receipt of benefits to which Plaintiff is entitled.

The final decision of the Commissioner is reversed and the Commissioner is ordered to award Plaintiff the benefits to which he is entitled.

The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See also, McDannel v. Apfel,* 78 F.Supp.2d 944 (S.D.Iowa 1999) (discussing, among other things, the relationship between the EAJA and fees under 42 U.S.C. § 406 B), and LR 54.2(b) [2].

IT IS SO ORDERED.

---

**2.** N.B. Counsel is reminded that LR 54.2(b), states that an EAJA application "must specifically identify the positions taken by the government in the case that the applicant alleges were not substantially justified."